E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental Crimes and Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Public Corruption and Civil Rights Section
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3359/8644/3819/0304
     E-mail:  Mark.A.Williams@usdoj.gov
              Matthew.O'Brien@usdoj.gov
              Brian.Faerstein@usdoj.gov
              Juan.Rodriguez@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>JERRY NEHL BOYLAN,<br><br>          Defendant. | No. CR 22-482-GW<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT (DKT. NO. 415); EXHIBITS 1-4 |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Mark Williams,

Matthew O'Brien, Brian Faerstein, and Juan Rodriguez, hereby files

its opposition to defendant JERRY NEHL BOYLAN's Objections to the Presentence Report (Dkt. No. 415).

This opposition is based upon the attached memorandum of points and authorities and exhibits thereto, the Presentence Investigation Report ("PSR") and United States Probation Office ("USPO") sentencing recommendation letter, the government's previously-filed sentencing position, trial testimony and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 23, 2024          Respectfully submitted,

                               E. MARTIN ESTRADA
                               United States Attorney

                               MACK E. JENKINS
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____/s/_____
                               MARK A. WILLIAMS
                               MATTHEW W. O'BRIEN
                               BRIAN R. FAERSTEIN
                               JUAN M. RODRIGUEZ
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION................................................1

II.   DEFENDANT'S LEGAL OBJECTIONS TO THE PSR'S GUIDELINES
      ANALYSIS SHOULD BE OVERRULED................................1

      A.    Abuse of Position of Trust or Use of Special Skill
            Enhancement Applies...................................1

            1.    Section 3B1.3 Does Not Require Intentional
                  Wrongdoing, and Defendant Engaged in Misconduct
                  In Any Event....................................2

            2.    Section 3B1.1 Does Not Require Concealment......4

            3.    There Is No Impermissible Double-Counting.......7

            4.    The PSR's Factual Basis Supports the Enhancement.....9

      B.    Zero-Point Offender Reduction Does Not Apply.........11

      C.    Section 2A1.4 Base Offense Level Is Properly
            Calculated...........................................12

III.  DEFENDANT'S FACTUAL OBJECTIONS TO THE PSR SHOULD BE
      OVERRULED..................................................12

      A.    Legal Standard.......................................12

      B.    Information Regarding the *Vision* and *Condor Express*
            Fires Is Accurate and Relevant to Sentencing.........13

      C.    Information Regarding Lack of Crew Training and
            Drilling in Fire Safety Procedures Is Accurate.......15

      D.    Information Regarding the *Conception* Fire Is Accurate....17

      E.    Statements Regarding the Escape Hatch Are Neither
            Inaccurate Nor Factual Assertions....................19

      F.    Information Regarding Defendant's Other Failures Is
            Accurate.............................................20

      G.    Victims' Cause of Death..............................24

      H.    Defendant's Illegal Dumping of Sewage................25

IV.   CONCLUSION.................................................25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

Burrage v. United States,
5   571 U.S. 204 (2014) ............................................. 11

6

Poor Thunder v. United States,
7   810 F.2d 817 (8th Cir. 1987) ................................... 12

8

United States v. Archdale,
   229 F.3d 861 (9th Cir. 2000) .................................... 8

9

United States v. Armstrong,
10   165 F.3d 918 (9th Cir. 1998) ................................. 3, 5

11

United States v. Brickey,
   289 F.3d 1144 (9th Cir. 2002) ................................... 3

12

United States v. Christiansen,
13   958 F.2d 285 (9th Cir. 1992) ................................... 2

14

United States v. Contreras,
   581 F.3d 1163 (9th Cir. 2009) .............................. 2, 5, 6

15

United States v. Contreras,
16   593 F.3d 1136 (9th Cir. 2010) (en banc) ..................... 2, 5

17

United States v. Franklin,
18   18 F.4th 1105 (9th Cir. 2021) ................................. 13

19

United States v. Green,
   988 F.2d 123 (9th Cir. 1993) ................................... 5

20

United States v. Harmath,
21   580 F. App'x 591 (9th Cir. 2014) .............................. 5

22

United States v. Kubick,
23   205 F.3d 1117 (9th Cir. 1999) .................................. 7

24

United States v. Nieves-Mercado,
   847 F.3d 37 (9th Cir. 2017) ................................ 13, 20

25

United States v. Petri,
26   731 F.3d 833 (9th Cir. 2013) ............................... 12, 20

27

United States v. Reese,
   2 F.3d 870 (9th Cir. 1993) ................................. 7, 8, 9

28

United States v. Spangle,
   626 F.3d 488 (9th Cir. 2010) ................................. 13, 19

United States v. Technic Servs., Inc.,
   314 F.3d 1031 (9th Cir. 2002) ................................. 3, 4

United States v. Tribble,
   206 F.3d 634 (6th Cir. 2000) ................................... 6

United States v. Williams,
   954 F.2d 204 (4th Cir. 1992) ................................... 8

United States v. Yang,
   No. 23-100 (JDB), 2024 WL 519962 (Dist. D.C. Feb. 9, 2024) ....... 12

**Statutes and Regulations**

18 U.S.C. § 3553 ................................................. 25

18 U.S.C. § 3661 ................................................. 13

46 C.F.R. § 185.506(e) ........................................... 24

**Rules**

Fed. R. Crim. P. 32 ........................................... 12, 20

**Sentencing Guidelines**

U.S.S.G. § 2A1.4 ........................................... 7, 8, 12

U.S.S.G. § 3B1.3 .......................................... passim

U.S.S.G. § 4C1.1 ........................................... 11, 12

U.S.S.G. § 6A1.3 ................................................. 20

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2
## I.    INTRODUCTION

3      Defendant's Objections to the Presentence Investigation Report

4 read like a textbook in revisionist history.  The defense puts forth

5 a counterfactual narrative of what led to the deaths of defendant's

6 34 innocent victims on September 2, 2019 -- continuing to show

7 defendant's lack of contrition and appreciation for the atrocity he

8 caused.

9      The PSR correctly calculates the Guidelines range and contains

10 an accurate and appropriate recitation of the facts.  In response,

11 the defense misstates the law, relying on overruled case law and

12 obfuscating with no authoritative support.  The defense misstates the

13 facts, misleadingly cherry-picking from the record and omitting

14 material information that supports the factual statements they contest.

15      Defendant did not file Rule 29 or Rule 33 motions challenging

16 the sufficiency or weight of the evidence, presumably in recognition

17 of the overwhelming evidence of his guilt.  Yet the defense takes

18 this opportunity to try to rewrite the record of defendant's

19 misconduct and recklessness.  The Court should overrule all of

20 defendant's objections to the PSR.

21
## II.   DEFENDANT'S LEGAL OBJECTIONS TO THE PSR'S GUIDELINES ANALYSIS SHOULD BE OVERRULED
22

### A.    Abuse of Position of Trust or Use of Special Skill Enhancement Applies
23

24      The USPO appropriately applied a two-level upward adjustment

25 under U.S.S.G. § 3B1.3, which encompasses defendant's abuse of his

26 position of trust and his use of a special skill in the commission of

27 his offense.  As the government explained in its sentencing position,

28 defendant's offense implicated both independent prongs of Section

3B1.3, and the enhancement applies.  (See Dkt. No. 420 at 17-19.)

Defendant posits four objections to the application of the adjustment, all of which are without merit and should be overruled.

        1.    <u>Section 3B1.3 Does Not Require Intentional Wrongdoing, and Defendant Engaged in Misconduct In Any Event</u>

Defendant first contends, without authoritative support, that Section 3B1.3 "cannot apply where . . . the crime of conviction was not committed intentionally."  (Obj. at 1.)  Nothing in the text of Section 3B1.3 or the case law interpreting it restricts the provision solely to offenses involving an element of intentional wrongdoing.

Defendant points to an embezzlement case, <u>United States v. Christiansen</u>, 958 F.2d 285 (9th Cir. 1992), for the purported proposition that defendant must be found to have "exploited the trust relationship to facilitate the offense."  (Obj. at 1.)  But <u>Christiansen</u> was decided in 1992, when the commentary to Section 3B1.3 offered only "spare" guidance as to the application of the enhancement and had yet to be revamped significantly in 1993.  <u>United States v. Contreras</u>, 581 F.3d 1163, 1165 (9th Cir. 2009), <u>aff'd in part, vacated in part en banc</u>, 593 F.3d 1135 (9th Cir. 2010); <u>see also</u> U.S.S.G. Amend. 492 (Nov. 1, 1993) (substantively rewriting application note 1 to Section 3B1.3).  The Ninth Circuit has "looked on pre-1993 caselaw with disfavor" in interpreting Section 3B1.3.  <u>Contreras</u>, 581 F.3d at 1166.  <u>Christiansen</u> has dubious authority or relevance to this or any other case, and it says nothing about restricting the enhancement only to cases involving intent.[1]

---

[1] <u>Christiansen</u> has not been cited in the Section 3B1.1 context in the Ninth Circuit after <u>Contreras</u> nor by any published Ninth Circuit opinions <u>at any time</u> for the supposed "exploited the trust
*(footnote cont'd on next page)*

2

1    Defendant also points to some cases in which the enhancement has

2    been applied to "intentional crime" (Obj. at 2), but identifies

3    nothing barring its application to the situation here.  Having sworn

4    an oath to uphold the law, defendant recklessly and deliberately, as

5    a matter of course, disregarded numerous safety requirements in place

6    to protect the lives (both passengers and crew) entrusted to him.

7    The analysis of the 3B1.3 enhancement is fact specific, and context

8    matters.  See United States v. Brickey, 289 F.3d 1144, 1155 (9th Cir.

9    2002) ("In applying the abuse of trust adjustment, the sentencing

10   court must consider all relevant conduct as well as the conduct

11   involved in the offense of conviction.").  The context of this case,

12   involving repeated and deliberate violations of core safety

13   requirements, is no exception.

14       Moreover, the Ninth Circuit has recognized that supervisors in

15   industries governed by safety regulations likely occupy a position of

16   private trust vis-à-vis their employees.  See United States v.

17   Technic Servs., Inc., 314 F.3d 1031, 1052-53 (9th Cir. 2002)

18   (licensed asbestos-remediation supervisor "held a position of

19   [private] trust with respect to [his employees]" where employees

20   relied on the defendant "to conduct the asbestos abatement in

21   accordance with safety regulations").  Defendant held a position of

22   trust as to his crew who counted on him for guidance and safety, and

23   the same holds true for the passengers who put their lives in his hands

24   and trusted he would follow the law and fulfill his safety obligations.

25       Defendant's reliance on the underlying charge being an "analogue

26

27   relationship" requirement.  The only other case defendant cites for
     this proposition, United States v. Armstrong, 165 F.3d 918 (9th Cir.
     1998) (unpublished), summarily relies on the same flawed reasoning

28   and, as an unpublished case from before 2007, is cited by defendant
     in violation of Ninth Circuit rules.  See Ninth Circuit Rule 36-3(c).

                                      3

to involuntary manslaughter" (Obj. at 2), is similarly misplaced. Defendant was charged and convicted with "misconduct and/or gross negligence of ship officers."  (Dkt. No. 320 (Final Jury Instructions) at 4.)  This required the government to prove, among other things, that defendant "engaged in misconduct and/or acted with gross negligence which means acting with wanton or reckless disregard for human life," and "he deliberately disregarded that substantial and unjustifiable risk of creating a potentially life-threatening condition of which he was aware." (Id. (emphases added).)  The defense conceded at trial that defendant did not maintain a roving patrol, and the government presented overwhelming evidence that defendant habitually disregarded numerous other safety regulations, including training and drilling his crew on fire safety.

On this record, defendant astonishingly claims that "there was no dispute that this was a terrible, tragic accident."  (Obj. at 2.) Nothing could be further from the truth.  The mass atrocity defendant caused was predictable and preventable given his deliberate decisions to violate numerous safety requirements while his passengers and crew trusted him to keep them safe.

   2.   Section 3B1.1 Does Not Require Concealment

Defendant's second legal challenge to the enhancement once again gets the law wrong.  Defendant claims that the government must prove defendant engaged in "concealment," but the plain text of Section 3B1.3 and controlling case law say otherwise.

Specifically, the enhancement applies where the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3 (emphasis added).

4

1  Commission or concealment of the offense is disjunctive, not

2  conjunctive.  Even a case defendant cites -- United States v. Green,

3  988 F.2d 123 (9th Cir. 1993) (another pre-2007 unpublished opinion)

4  -- recognizes that the "enhancement applies if the defendant's

5  position facilitated commission or concealment of the offense,

6  whether or not it facilitated both."  Id. at *2.  Section 3B1.3

7  requires a showing of only one, not necessarily both, of facilitating

8  the commission or concealment of the offense.

9      Defendant further misstates the law by relying on authority the

10  Ninth Circuit has overruled.  Defendant (impermissibly) cites the

11  pre-2007 unpublished opinion in United States v. Armstrong, 165 F.3d

12  918 (9th Cir. 1998), claiming "[t]he primary trait that distinguishes

13  a person in a position of trust from one who is not is the extent to

14  which the position provides the freedom to commit a difficult-to-

15  detect wrong."  (Obj. at 2-3 (quoting Armstrong, 165 F.3d at *2).)

16  However, in Contreras, the Ninth Circuit found the "difficult-to-

17  detect wrongs" test, which arose from a line of authority preceding

18  the 1993 amendment to Section 3B1.3, to be "incompatible" with the

19  new 3B1.3 commentary and no longer the focus of its analysis.

20  Contreras, 581 F.3d at 1165-66.  Sitting en banc, the Ninth Circuit

21  overruled prior precedent in conflict with its interpretation of

22  Section 3B1.3.  Contreras, 593 F.3d at 1136; see also United States

23  v. Harmath, 580 F. App'x 591, 597 n.2 (9th Cir. 2014) ("[M]any of the

24  cases on which the parties rely, which use the 'difficult to detect'

25  test for the 'abuse of trust' enhancement, are no longer good law."

26  (relying on Contreras, 593 F.3d. at 1136, adopting, 581 F.3d at 1168)).

27      The Contreras court thus held, "[b]y the test's plain text, the

28  element of discretion -- not ease of detection -- is the 'decisive

1    factor' in the enhancement." Contreras, 581 F.3d at 1166 (quoting
2    United States v. Tribble, 206 F.3d 634, 637 (6th Cir. 2000)).
3    Whether defendant holds a position of trust principally turns on his
4    level of "professional or managerial discretion," and the question
5    then becomes whether "the position 'significantly facilitate[d]' the
6    commission of the crime." Id. at 1165.  The ease of avoiding
7    detection does not define a position of trust nor is there any
8    requirement that the position facilitate concealment of the crime.
9    Defendant, a licensed captain with full authority over the *Conception*
10   at sea, plainly qualifies as holding a position of private trust
11   under the discretion test; defendant's vast authority facilitated his
12   offense by allowing him to take 39 passengers and crew to sea without
13   fulfilling his core safety obligations.

14        Defendant's claim that "there was no concealment" is thus
15   irrelevant.  (Obj. at 3.)  It's also wrong.  For example, the defense
16   claims that Coast Guard Inspector Daniel Hager testified that
17   defendant "did not conceal anything about his operation of the
18   [*Conception*]" during the ship's last inspection in February 2019.
19   (Obj. at 3.)  But in fact, upon the Court's inquiry, Hager clarified
20   that he did not "specifically recall the inspection that was
21   conducted in February 2019" with defendant.  (Dkt. No. 369 at 57:22-
22   24; see also id. at 59:15-18 (Hager does not recall "any specifics
23   from that day").)  The defense also misleadingly claims that "Hager
24   testified that he would not have asked about roving patrols or night
25   watchmen during an annual inspection."  (Obj. at 3.)  But in fact,
26   Hager testified that, as his general practice, he would have shown
27   defendant a copy of the *Conception's* Certificate of Inspection
28   containing the roving patrol requirement in all capital letters on

1    the first page, ask if defendant had any questions, and "presume he

2    understood [the requirement]" if defendant had none. (Dkt. No. 369

3    at 88:12-89:19.)  Defendant's victims also stepped foot aboard the

4    *Conception* with the expectation -- and false sense of security --

5    that their Captain was following the law and would keep them safe.

6    The 34 victims are no longer able to express the depths of that

7    broken trust.  But their family and friends are, as reflected in the

8    numerous victim impact statements submitted to the Court. (Dkt. No.

9    424 (filed under seal).)

10       Defendant's abuse of his position of private trust justifies the

11    2-level enhancement under Section 3B1.3.

12              3.    There Is No Impermissible Double-Counting

13       Defendant's third challenge to the 3B1.3 enhancement further

14    misapprehends the law albeit without citing a single case.  Contrary

15    to defendant's claim, Section 3B1.3 does not "amount to double

16    counting" as to the "reckless operation of a means of transportation"

17    factor in the 2A1.4 base offense level. (Obj. at 4.)  The provisions

18    reflect "distinct harms" and thus no double counting is implicated.

19    United States v. Kubick, 205 F.3d 1117, 1125 (9th Cir. 1999).

20       Impermissible double counting "occurs where one part of the

21    Guidelines is applied to increase a defendant's punishment on account

22    of a kind of harm that has already been fully accounted for by the

23    application of another part of the Guidelines." United States v.

24    Reese, 2 F.3d 870, 895 (9th Cir. 1993) (emphasis added).  The defense

25    contends that "means of transportation" accounts for defendant being

26    in a "trust position" as the "the captain of the vessel." (Obj. at

27    4.)  The defense is wrong.  The Sentencing Commission explained that

28    the "means of transportation" offense level is meant to "address

7

1  disparities between federal and state sentences for vehicular

2  manslaughter." U.S.S.G. Amend. 663 (Nov. 1, 2004). Defendant's base

3  offense level thus accounts for the increased dangerousness of acting

4  recklessly while operating a means of transportation (e.g., vehicular

5  manslaughter). The base offense level neither contemplates nor

6  requires that the operator of the means of transportation have

7  passengers entrusted to them or that they have a special skill.

8      Thus, defendant's base offense level of 22 does not account for

9  defendant's abuse of position of trust vis-à-vis the 34 people who

10 were killed on his watch or his use of a special skill in operating

11 the Conception. See Reese, 2 F.3d at 895 (no double counting where

12 "base offense level will not necessarily have been set to capture the

13 full extent of the wrongfulness of such behavior"); United States v.

14 Archdale, 229 F.3d 861, 869 (9th Cir. 2000) (same).

15     The Sentencing Commission "plainly understands the concept of

16 double counting, and expressly forbids it where it is not intended."

17 Reese, 2 F.3d at 894 (quoting United States v. Williams, 954 F.2d

18 204, 208 (4th Cir. 1992)). Examples abound of offense guidelines

19 doing just that, including with respect to the position of trust

20 enhancement.[2] Section 2A1.4 is not included in this list because

21 there is no possibility of double counting the 3A1.3 adjustment.

22     In sum, the Guidelines compel that Section 3B1.3 be applied

23 here, because "when more than one kind of harm is attributable to a

24 given aspect of a defendant's conduct, failure to enhance his

25

26     [2] See, e.g., U.S.S.G. §§ 2A3.1, cmt. n.3(b); 2A3.2, cmt. n.2(b);
   2A3.3, cmt. n.4; 2A3.4, cmt. n.4(b); 2B1.1, cmt. n.7, n.8(E)(i),
27 n.11, n.16(C); 2C1.1, cmt. n.6; 2C1.2, cmt. n.4; 2C1.3, cmt. n.1;
   2C1.5, cmt. n.5; 2D1.1, cmt. n.23; 2E5.1, cmt., n.5; 2G1.3, cmt.
28 n.2(B); 2G2.1, cmt. n.5(B); 2G2.6, cmt. n.2(B); 2H1.1, cmt. n.5;
   2P1.1, cmt. n.6; 2P1.2, cmt. n.2; 2T1.4, cmt. n.2.

8

1  punishment for each harm caused thereby would defeat the Commission's

2  goal of proportionality in sentencing." <u>Reese</u>, 2 F.3d at 895.

3           4.    <u>The PSR's Factual Basis Supports the Enhancement</u>

4       Finally, defendant erroneously claims the factual basis the PSR

5  provides for application of the 3B1.3 enhancement is incorrect.

6       Incredibly, in challenging the PSR's factual basis, the defense

7  selectively ignores half of the PSR's factual basis for the

8  enhancement. (Obj. at 4.) In full, paragraph 67 of the PSR provides:

9           Here, Boylan was the captain and master of the Conception
            which allowed him to take passengers and crew members out
10          to sea to remote locations, hours away from any help. He
            was entrusted with the safety and wellbeing of his
11          passengers and training his crew to maintain the
            passenger's safety. **When the fire was discovered on the
12          Conception, Boylan was the first to abandon the boat by
            jumping into the ocean and ordered his crew members to
13          abandon the boat without making any efforts to save the 33
            passengers and one crewmember, even after two other
14          crewmembers returned to the Conception to look for
            survivors.** Based on the foregoing, it is the undersigned
15          Probation Officer's assessment that Boylan abused his
            position of trust to the passengers and their families to
16          keep them safe.

17  (PSR ¶ 67 (sentence challenged by defendant in bold emphasis).)

18       The first two sentences that defendant omits go to the heart of

19  his abuse of his position of trust and use of his special skill in

20  the commission of his offense, as the government explains above and

21  in its sentencing position. (Dkt. No. 420 at 17-19.)

22       So too does the bolded sentence that defendant challenges which,

23  despite defendant's misleading spin, is accurate. The surviving

24  crewmembers testified that defendant was the first person to jump off

25  the *Conception*. (Dkt. No. 362 at 63:3-7; Dkt. No. 341 at 30:22-

26  31:24; Dkt. No. 340 at 21:24-22:6.) He did so right after his Mayday

27  call. Defendant never jumped down to the main deck with the rest of

28  his crew to attempt to fight the fire or try to rescue the victims

9

1  trapped in the bunk room.  First Galley Ryan Sims testified that,

2  while still in the wheelhouse, defendant instructed him to "abandon

3  ship," before defendant did so himself.  (Dkt. No. 363 at 17:12-14.)

4  First Deckhand Milton French remembered defendant "saying to get off

5  the boat into the water" when defendant came up for air after jumping

6  in the water.  (Dkt. No. 362 at 64:10-12.)  Defendant claims he

7  "reboarded" the ship, but Second Captain Cullen Molitor testified

8  that he and French "pulled [defendant] into the skiff . . . from the

9  water" and Molitor did not recall defendant getting back on the

10  *Conception*.  (Dkt. No. 341 at 37:23-38:4.)  Regardless of whether

11  defendant reboarded, French could not remember "seeing Jerry doing

12  anything" prior to their launching the skiff boat.  (Id. at 70:23-

13  71:3.)  The PSR's statement that defendant "ordered his crew members

14  to abandon the boat without making any efforts to save the 33

15  passengers and one crewmember" is accurate.

16      Defendant claims that a crewmember's testimony about a "five-

17  second little huddle up" in the wheelhouse -- after years of no fire

18  preparedness planning whatsoever -- and defendant's instruction to

19  the crew to jump down to the main deck somehow supports his "efforts

20  to save the passengers."  (Obj. at 4.)  The Court should reject this

21  desperate rationalization.  Defendant made no attempt to save the

22  victims, jumped off the boat, and ordered his crew to do the same.

23  In addition to his abysmal fire safety practices in the lead-up to

24  the trip, these failures on the night of the fire underscore

25  defendant's abuse of his position of trust.[3]

26

27  ─────────────────

28      [3] Defendant does not separately challenge the other independent
   basis for the application of Section 3B1.3 here, i.e., "special
   skill" as a licensed captain.  (See Dkt. No. 420 at 18-19.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Zero-Point Offender Reduction Does Not Apply**

Defendant challenges the PSR's conclusion that the Zero-Point
Offender reduction in Section 4C1.1 does not apply, taking issue with
the straightforward application of that provision.  (Obj. at 5-6.)

Section 4C1.1(a)(4) provides that in order for a defendant to be
eligible for the reduction, "the offense [of conviction] did not
result in death or serious bodily injury."  U.S.S.G. § 4C1.1(a)(4).
Here, the jury necessarily found that defendant's misconduct and/or
gross negligence "played a substantial part in bringing about the
death [of one or more victims], so that the death was the direct
result or a reasonably probable consequence of the Defendant's
misconduct and/or gross negligence."  (Dkt. No. 320 at 4.)   Indeed,
the indictment alleged, and the government proved at trial, that
defendant's conduct "caused the deaths" of the 34 victims killed
aboard the *Conception*.  (Dkt. No. 1.)  The offense thus "result[ed]
in death" and defendant is ineligible for the 4C1.1 reduction.

To get around this clear bar to eligibility, defendant attempts
for a third time -- having been twice rebuffed by the Court -- to
import the case of Burrage v. United States, 571 U.S. 204 (2014),
where it has no application.  Burrage pertains to a challenge to the
causation element in a death-resulting drug case; it has nothing to
do with the offense at issue here, as the Court found in denying a
motion to dismiss and a proposed jury instruction premised on Burrage
(see Dkt. No. 359 at 9:11-11:23, 22:4-23:14), nor does it have
anything to do with the Guidelines.  And while Section 4C1.1(a)(4)
does not appear to have been litigated much, at least one court
observed that the "Sentencing Commission and Congress knew how to
frame a disqualifying factor in terms of the broader 'result' of an

11

1   offense and did so in subsection (a)(4)." <u>United States v. Yang</u>, No.

2   23-100 (JDB), 2024 WL 519962, at *4 (Dist. D.C. Feb. 9, 2024).  The

3   Court once again should reject defendant's attempt to sow confusion

4   where none exists.  The Section 4C1.1 reduction does not apply.

5       **C.    Section 2A1.4 Base Offense Level Is Properly Calculated**

6       Defendant states only that he "may object to the base offense

7   level at a later date," notwithstanding the time restrictions of Rule

8   32(f)(1).  (Obj. at 6.)  For present purposes, the government notes

9   that the PSR correctly calculates the base offense level (PSR ¶¶ 57-

10  63), and the government provided additional Section 2A1.4 offense

11  level analysis in its sentencing position.  (Dkt. No. 420 at 13-17.)

12  **III. DEFENDANT'S FACTUAL OBJECTIONS TO THE PSR SHOULD BE OVERRULED**

13      **A.    Legal Standard**

14      For disputed factual matters in the PSR, the court must "rule on

15  the dispute or determine that a ruling is unnecessary either because

16  the matter will not affect sentencing, or because the court will not

17  consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).

18  "Only specific factual objections trigger Rule 32(i)(3)(B).  A

19  specific factual objection addresses a factual inaccuracy; it does

20  not merely object to recommendations, opinions, or conclusions."

21  <u>United States v. Petri</u>, 731 F.3d 833, 841 (9th Cir. 2013) (cleaned

22  up).  As one court recognized:

23          Rule 32 must be given a reasonable and practical
            construction.  It should not be turned into a vehicle for
24          verbal quibbles or argumentation about phrasing.  The point
            of the rule is that misstatements of fact material to
25          sentencing or to parole be corrected, not that presentence
            reports necessarily be phrased in every particular in such
26          a way as to eliminate every nuance or implication to which
            a defendant might object.

27

28  <u>Poor Thunder v. United States</u>, 810 F.2d 817, 826 (8th Cir. 1987).

1    The government bears the burden of proving by a preponderance of

2    the evidence any facts underlying a base offense level or sentencing

3    enhancement.  United States v. Franklin, 18 F.4th 1105, 1117 (9th

4    Cir. 2021).  Generally, "there is no limitation on the information

5    which a court may consider in sentencing other than that the

6    information bear sufficient indicia of reliability to support its

7    probable accuracy," including hearsay.  United States v. Nieves-

8    Mercado, 847 F.3d 37, 42 (9th Cir. 2017); see also 18 U.S.C. § 3661.[4]

9    **B.  Information Regarding the *Vision* and *Condor Express* Fires
     Is Accurate and Relevant to Sentencing**

10

11    ***Vision* Fire.**  The defense claims defendant was not informed

12    about the fire on the *Vision* in October 2018 by *Vision* Captain Thomas

13    Cappannelli, attaching a report of a government interview with

14    Cappannelli from October 2, 2023 (just before trial).  (Obj. at 7,

15    Exh. A.)  During that interview, Cappannelli acknowledged only that

16    he "'he may have' spoken with BOYLAN regarding the M/V VISION battery

17    fire but he cannot pinpoint a time."  (Id., Exh. A at 1.)  What the

18    defense fails to mention, however, is that Cappannelli met with the

19    government four years earlier, on October 10, 2019 -- just one year

20    after the *Vision* fire in 2018.  During that meeting, Cappannelli

21    informed investigators that after the *Vision* fire incident, he "told

22    [the Truth Aquatics owner], Boylan and [another Truth Aquatics

23    employee].  In response, [the owner] told Cappannelli that passengers

24    had been requesting more charging ports be installed in the bunkroom

25    however [the owner] was against it because it would be a fire

26

27       [4] The Ninth Circuit reviews a sentencing court's factual
      findings for clear error, i.e., whether the findings "were illogical,
28    implausible, or without support in the record."  United States v.
      Spangle, 626 F.3d 488, 497 (9th Cir. 2010).

hazard," reflecting that Cappannelli's notification must have come
before the *Conception* fire.  (<u>See</u> **Exhibit 1** hereto at 2.)
Cappannelli's interview from October 2019, closer in time to the
*Vision* fire and before he understood the government sought to call
him to testify against defendant (his former colleague), provides a
reliable basis for establishing defendant's knowledge of the fire.

The defense's hysterical claim that "the entire PSR and the
recommendation letter should be reevaluated" because of references to
the *Vision* fire should be rejected.  (Obj. at 7.)  Whether or not
defendant learned about that 2018 fire (he did), he should have known
about and been prepared for the danger of a fire at sea as a licensed
captain for decades.  The Court agreed: "the defense can't be arguing
[boat fires are not foreseeable] because if the defense were to argue
that . . . I don't know if I would permit it, because it would be
such an idiotic thing to say."  (Dkt. No. 363 at 58:4-7.)

***Condor Express* Fire**.  The government is attaching as **Exhibit 2**
hereto a report of an interview with Captain Matthew Curto, which
supplements his trial testimony about the *Condor Express* fire in
March 2013 in the same six-vessel slip as the *Conception* (Dkt. No.
363 at 80-81).  Taken together, the evidence demonstrates that the
*Condor Express* fire overtook the whole wheelhouse and was a very big
local media event; the burned ship sat for days in the same slip
while defendant was captain of the *Conception*; the *Condor Express* was
out of commission for months, noticeably absent from its slip right
next to the *Conception*; numerous photos reflect the breadth of the
*Condor Express* fire and the *Condor Express's* direct proximity to the
*Conception* (see **Exhibit 3** hereto); Curto spoke to the Truth Aquatics
owner about the fire; Curto worked part-time on Truth Aquatics ships,

14

including the *Conception*, during the time he worked on the *Condor Express*; and Curto "was '100%' confident Boylan had knowledge and awareness about the fire but he was not confident Boylan knew of the suspected cause." (Exh. 2 at 2.)

Contrary to the defense's contention, the Court did not ultimately "rule[] that the government could not introduce [*Condor Express* fire evidence] at trial" without other evidence of defendant working in March 2013. (Obj. at 8.) Indeed, the Court permitted Curto to testify about the *Condor Express* fire. (Dkt. No. 363 at 80-81.) The evidence demonstrates by a preponderance of the evidence that defendant knew about the *Condor Express* fire as well.

## C. Information Regarding Lack of Crew Training and Drilling in Fire Safety Procedures Is Accurate

Defendant challenges statements in paragraphs 21 and 26(a), 26(b), and 26(c) of the PSR regarding the *Conception* crew's lack of training on the fire hose stations on the ship. (Obj. at 8-10.) The statements are all accurate, reflecting the largely uncontested fact at trial that defendant never conducted a <u>single</u> drill with his crew.

**First Deckhand Milton French.** The PSR accurately states that "French testified that Boylan never drilled French on how to use the *Conception's* fire stations." (PSR ¶ 26(a); Obj. at 9.) French testified that he had never used or activated the *Conception*'s firehoses nor seen them activated, had never seen them unspooled from their stations, and had never done a fire drill on the *Conception*. (Dkt. No. 361 at 170:16-18, 171:2-5, 172:5-6, 172:21-173:2; Dkt. No. 362 at 130:4-12.) The defense misleadingly points to French having run the "fire pump" on the boat, located down in the engine room, and French confirming that defendant "told [him] how to get the firehose

started from [the] fire station." (Obj. at 9.) But French explained
they would not activate the fire stations on the main deck when
running the pump in the engine room. (Dkt. No. 362 at 133:2-10.)
And running the engine room fire pump to prevent corrosion and being
told how to start a firehose is not the same thing as being shown how
the firehoses are started, unspooling the actual hoses from the fire
stations, and practicing through drills. It's akin to the local fire
department <u>never</u> having taken out fire hoses for practice before
responding to a fire. Defendant never trained or drilled French (or
any crewmember) in any of these ways, as the PSR accurately reflects.

**Second Captain Cullen Molitor.** The PSR accurately states that
"Molitor testified that Boylan had never drilled Molitor on how to
use the ship's fire stations, and Molitor did not know how to use
them." (PSR ¶ 26(a); Obj. at 9.) Molitor testified that he was
never instructed how to use the firehoses, never used or activated
one, and had never done a fire drill on the *Conception*. (Dkt. No.
364 at 75:22-76:9, 77:3-78:4; Dkt. No. 365 at 13:12-14.) Defendant
points only to Molitor being shown where the fire stations were
located and his confirmation he "understood how those worked." (Obj.
at 9.) But once again, knowing where the fire hose is located and
having a vague understanding of how it worked is not the same thing
as practicing and learning how to use it through training and drills.

**Second Deckhand Alexandra Kurtz.** The PSR accurately states that
the "testimonies of the surviving crewmembers indicated that Kurtz
had never used the ship's fire stations because Boylan had never
drilled her." (PSR ¶ 26(c); Obj. at 9-10.) The defense does not
dispute that the surviving crewmembers confirmed that defendant did
not conduct any drills with them or Kurtz, who was working on only

16

her second overnight trip on the *Conception*.  Rather, the defense

points solely to the testimony of a former crewmember (Evan Jones

Toscano) who testified about French (not defendant) taking him and

Kurtz down to the engine room (not the fire stations) to show how the

fire <u>pump</u> worked.  Defendant also points to Toscano confirming he and

Kurtz were shown the location of the fire stations.  None of this

contradicts that Kurtz (like the other crewmembers) had never used a

fire station, including through drills by defendant.[5]

Defendant's contention that the firehoses were not used solely

because of the "rapidly accelerating fire on the boat," and not

because of lack of crew training (Obj. at 10), underscores the

continued fallacy of his defense:  had defendant maintained a roving

patrol as required, his crew could have caught the fire before it

grew and, <u>had the crew been trained and drilled on the fire safety</u>

<u>equipment as required</u>, put the fire out.

### D.    Information Regarding the *Conception* Fire Is Accurate

Defendant incorrectly claims the PSR's description of the fire

on September 2, 2019 is "riddled with factual errors," contesting

four statements.  (Obj. at 10-13.)  Each statement is accurate.

**Second Galley Michael Kohls "then jumped down to the main deck**

**[from] the port side of the sun deck.  He ran past the fire station**

**on the port side of the main deck twice, not knowing that the fire**

**station was there or how to use it" (PSR ¶ 31).**  This statement is

accurate and fully supported by Kohls's testimony, during which he

described, with the aid of photographs of the *Conception*, the steps

---

[5] Galley crew Ryan Sims and Michael Kohls also testified they were
never trained on the fire hoses nor took part in any drills on the
*Conception*.  (Dkt. No. 362 at 153:18-154:18; Dkt. No. 363 at 11:1-7.)

1  he took after first seeing the fire.  (Dkt. No. 340 at 16:20-20:22.)

2  Defendant ignores Kohls's firsthand testimony, citing instead to

3  testimony of two other crewmembers who also were in the heat of the

4  moment.  Moreover, Kohls's testimony about trying to get to fire

5  extinguishers in the salon, as he understood the role of the galley

6  crew to be, does not change the PSR's accurate statement that Kohls

7  ran by the portside fire station twice without knowing it was there

8  nor how to use it.  (See Dkt. No. 362 at 153:18-154:18.)  Had defendant

9  properly trained Kohls, in the two years Kohls worked on the

10  *Conception*, how to use the fire stations, Kohls could have poured

11  unlimited amounts of water from the ocean on the fire.

12      **"No one grabbed the fire ax or fire extinguisher from the**

13  **wheelhouse prior to jumping" (PSR ¶ 32).**  This statement is accurate.

14  While defendant is correct that First Galley Ryan Sims testified that

15  defendant told him to grab the fire extinguisher in the wheelhouse,

16  defendant did not help Sims do so and quickly told Sims to "abandon

17  ship" when Sims was unable to grab it.  (Dkt. No. 363 at 16:4-5,

18  17:12-14.)  The fire extinguisher was within arm's reach of defendant

19  when he made his Mayday call from the wheelhouse, as reflected in

20  this photograph taken just days before the fire:



**Trial Exh. 81**

27  The fire ax was located on the wall just behind where defendant sat

28  in the wheelhouse.  (Dkt. No. 364 at 79:18-80:9.)  Defendant did not

use or drop down the fire extinguisher or fire ax to any of his crew who had jumped down to the main deck.  (Id.; Dkt. No. 341 at 30:9-18.)

**"Boylan did not give any commands on how to fight the fire" (PSR ¶ 38).**  This statement is accurate.  Defendant points, again, to the "five-second little huddle up" in the wheelhouse and defendant's instruction to the crew to jump down to the main deck and get people out.  (Obj. at 12.)  This has nothing to do with commanding his crew how to fight the fire, nor could a "five-second little huddle up" in the midst of a fire make up for months and years of defendant's failure to train his crew in firefighting.  Defendant also points to his instructing Sims to get the fire extinguisher but neglects to mention he instructed Sims to "abandon ship" immediately thereafter.

**"When the fire was discovered on the _Conception_, Boylan was the first to abandon the boat by jumping into the ocean and ordered his crew members to abandon the boat without making any efforts to save the 33 passengers and one crewmember (PSR ¶ 67).**  This statement is accurate, as the government explained above in response to defendant's challenge to the factual basis for the Section 3B1.3 enhancement.  (See supra pp. 9-10.)

**E.    Statements Regarding the Escape Hatch Are Neither Inaccurate Nor Factual Assertions**

Defendant challenges two sentences in paragraph 62 of the PSR about it being "unknown" whether the victims could have escaped through the escape hatch had they known of its existence and it being "unknown" whether anything was on top of the escape hatch obstructing the victims' use of it.  (Obj. at 13-15.)  As an initial matter, the statements themselves are accurate as written in terms of what was "unknown."  Second, none of the information the defense points to in

19

1  seeking to rebut these non-factual assertions changes the fact that

2  <u>defendant</u> never took the passengers down to the bunkroom, or directed

3  any of his crewmembers to do so, to show his passengers how to access

4  the escape hatch.  And third, under Rule 32(i)(3)(B), the Court is

5  not required to resolve objections to these non-factual assertions

6  that amount to "opinions" or "conclusions."  <u>Petri</u>, 731 F.3d at 841.

7  **F.    Information Regarding Defendant's Other Failures Is
         Accurate**

8

9  Defendant further challenges the accuracy and inclusion of

10  several other statements in the PSR regarding other safety failures

11  by defendant as Captain of the *Conception*.  (Obj. at 15-19.)

12  Defendant appears to contend that certain of these statements should

13  not be included in the PSR or considered at sentencing because of the

14  Court's rulings as to admissibility of certain evidence <u>at trial</u>.  At

15  sentencing, of course, the Court may consider any "relevant

16  information without regard to its admissibility under the rules of

17  evidence applicable at trial, provided that the information has

18  sufficient indicia of reliability to support its probable accuracy."

19  U.S.S.G. § 6A1.3; <u>see also</u> <u>Nieves-Mercado</u>, 847 F.3d at 42 (same).

20  As for defendant's contentions regarding the accuracy of the

21  statements, the government responds as follows.

22  **Defendant "allowed passengers to board the *Conception* and sleep**

23  **in the bunkroom while it was docked the night before departure before**

24  **crew members were required to report to the ship" (PSR ¶¶ 21, 25) and**

25  **"did not require his crew to report to the ship until 3:00 a.m. on**

26  **August 31, 2019" (<u>Id.</u> ¶ 24)**.  Defendant does not contest the accuracy

27  of these statements about the night-before boarding procedures for

28  the *Conception* so much as the description of this being "Boylan's

20

1   practice," as the defense similarly contested at trial.  (Obj. at 15-

2   16.)  But it is what defendant did and thus his "practice,"

3   regardless of whether Truth Aquatics allowed passengers to board the

4   night before departure or other ships allowed the same.[6]  Defendant

5   was a licensed captain, holding a Merchant Mariner Credential since

6   1985 (renewing it every five years) and serving as Captain of the

7   *Conception* for decades.  Defendant swore an oath to uphold the law

8   and ensure the safety of his passengers.  If defendant had any

9   concerns about not upholding that oath or breaking the law, he was

10   obligated to raise it with his employer and not operate the

11   *Conception* in violation of his duties as the Captain.  He never did.

12      **"Boylan also allowed passengers to store coolers of beer on the**

13   **top of the escape hatch in the salon.  The escape hatch could not be**

14   **opened from the bunkroom when a beer cooler was on top of it . . .**

15   **The passenger saw ice chests being stored on top of the escape hatch**

16   **on multiple occasions, unsuccessfully tried to open the escape hatch**

17   **with an ice chest on top, and addressed his concerns to Boylan" (PSR**

18   **¶ 22).**  This statement is accurate, supported by information provided

19   by former passenger Mark Copple prior to trial.  Indeed, defendant

20   attaches a report of an interview with Copple conducted on September

21   13, 2019 (Obj., Exh. E) -- but fails to mention that Copple spoke

22   with the government again on October 17, 2023, in advance of trial,

23   with a report produced to the defense in discovery.  (See **Exhibit 4**

24

25   ────────────────

26      [6] One former *Conception* passenger described the practice of not
holding an orientation meeting until the morning after departure as
"unusual" based on his experience on scuba diving trips on other

27   boats.  (Dkt. No. 365 at 20:20-25 (Mark Copple: "Well, normally you
get on board and everything is done at that time you get on board.

28   After everybody is on board, there is a briefing and just a safety
type talk but, yeah.").)

hereto.)  Copple described seeing "times" (plural) when an ice chest
was on top of the escape hatch, and on one occasion he tried to open
the hatch from the bunkroom but was unable to do so due to an ice
chest.  (Id. at 2.)  The defense contests that Copple raised his
concern directly with defendant as opposed to another crewmember;
defendant claims "[t]here is no reason to believe that, had Mr.
Copple had this conversation directly with Mr. Boylan, he would not
have stated that directly."  (Obj. at 17.)  As the defense knows,
Copple did state directly that he discussed this with defendant:
"Copple spoke to Boylan about it and Boylan said there was not
another good place to store [the ice chest]."  (Exh. 5 at 2.)

**"Boylan, a smoker, did not provide instructions as to where
passengers should smoke cigarettes and how passengers should dispose
of their lit cigarette butts" (PSR ¶ 28).**  Defendant does not contest
the accuracy but rather the inclusion of this statement, which is
relevant to defendant's lack of care as to basic fire safety
procedures aboard the ship he captained.  Contrary to the defense's
aspersions, the government does not seek to "imbue the sentencing
proceedings in this case with the improper speculation that a
disposed cigarette may have caused the fire."  (Obj. at 17.)  Indeed,
the Court recognized the relevance of defendant's lack of fire safety
guidance to passengers on cigarette disposal, permitting the
government to inquire on this issue with Second Captain Molitor.
(See Dkt. No. 341 at 6:21-10:21.)  Defendant further points to there
being "no statute, rule, regulation, company policy, or other
authority" governing cigarette fire safety as a reason this
information should not be included (Obj. at 17), which is ironic
given the defense contested the government pointing to fire safety

1    regulations earlier in this case.  In any event, not instructing

2    passengers about where to smoke and dispose of cigarettes on an

3    isolated ship in the Pacific Ocean plainly bears upon defendant's

4    overall abysmal fire safety practices on the *Conception*.

5        **"[Boylan] also failed to inform his passengers that they should**

6    **not overload the ship's electrical outlets when charging their**

7    **equipment's batteries" (PSR ¶ 28); and "[a] photograph of a power**

8    **strip taken by a passenger that night depicted an overloaded power**

9    **strip" (<u>Id.</u> ¶ 29).**  Defendant similarly does not contest the accuracy

10   of these statements but rather their inclusion in the PSR.  (Obj. at

11   18.)  The rampant overcharging of batteries on the *Conception* at

12   night -- when defendant did not maintain a roving patrol with a crew

13   unprepared to fight a fire -- is directly relevant to defendant's

14   cavalier attitude toward his fire safety obligations.  Defendant

15   points once again to there not being any specific law, rule, or

16   policy that compelled him to instruct his passengers not to overuse

17   an electrical outlet.  But it should not have taken anything more

18   than common sense and prudent seamanship to appreciate that the

19   following overloaded power strip, which was photographed on the

20   *Conception's* fatal trip, constituted a potential fire hazard:

21
22
23   
24
25
26                        **Trial Exh. 153**

27   In fact, former passenger Copple was shown this photograph and told

28   investigators that he had seen this problem three times worse on the

*Conception*.  (Exh. 4 at 2.)  Crew witnesses testified at trial that the overnight charging (and overcharging) of batteries and devices was the norm.  (Dkt. No. 340 at 9:21-23; Dkt. 341 at 17:9-18:5; Dkt. No. 362 at 49:23-50:10.)  Defendant's claim that he did not know about this practice (Obj. at 18), which was out in the open virtually every night in the salon on a ship he captained for decades, is preposterous.  Given the obvious risks of not maintaining a roving patrol with an inexperienced and untrained crew, defendant's further failure to control the overnight overcharging of batteries on the *Conception* during the Labor Day Weekend trip and other trips is relevant conduct for sentencing.[7]

**"Boylan failed to have passengers don life jackets during the morning briefing despite Coast Guard regulations requiring him to do so" (PSR ¶ 28).**  Defendant does not contest the accuracy of this statement, but rather only its relevance.  Coast Guard regulations required defendant to have his passengers don life jackets during the safety briefings on trips lasting more than 24 hours.  See 46 C.F.R. § 185.506(e).  Defendant never did so, consistent with his practice of ignoring numerous other safety regulations.  Even though this was not expressly a fire safety practice, defendant's overall disregard for his safety obligations is relevant at sentencing.

### G.   Victims' Cause of Death

The government agrees with defendant that the PSR's statement that the "34 victims were burned to death" does not accurately reflect the cause of death.  (PSR ¶ 130; Obj. at 19.)  However, in

---

[7] Defendant notes that the power strip photograph was not admitted at trial but briefly published during witness testimony. (Obj. at 18.)  The error was inadvertent and corrected immediately. (Dkt. No. 362 at 10:8-11:5.)

24

paragraph 42, the PSR correctly states that the 34 victims "trapped in the bunkroom of the *Conception* died from smoke inhalation and asphyxiation by carbon monoxide poisoning." (PSR ¶ 42.) Paragraph 130 should be revised to incorporate that information.

### H. Defendant's Illegal Dumping of Sewage

While not contesting the accuracy of the information, defendant contends the PSR should not include reference to his practice of illegally dumping sewage from the *Conception's* "black water tank" in protected marine areas, including in the vicinity of his passengers when the ship was anchored at dive sites. (PSR ¶ 78; Obj. at 19.) Defendant's failure to obey regulations governing the disposal of sewage, including into the waters in which his passengers dove, further underscores his utter disregard for the law and the safety of his passengers. This is relevant to the 18 U.S.C. § 3553(a) factors, including the history and characteristics of the defendant and the need to promote respect for the law, and should be included in the PSR. Defendant's concern about the "salacious" nature of his misconduct is exactly the point (Obj. at 19); there is no longer a jury or evidentiary rules governing admissibility, and the Court should account for defendant's outrageous conduct and violations of the law as Captain of the *Conception* in determining his sentence.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court overrule defendant's objections to the Presentence Investigation Report.